UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
COMPAGNIE des GRANDS HÔTELS    )
D' AFRIQUE S.A.,               )
            Plaintiff,         ) No: 3:19-mc-105 (KAD)
     v.                        )
                               ) November 20, 2019
STARWOOD CAPITAL GROUP         )
GLOBAL I, LLC, and STARMAN     )
HOTEL HOLDINGS, LLC,           ) 11:05 a.m.
            defendants.        )
_____)

                    Brien McMahon Federal Building
                    915 Lafayette Boulevard
                    Bridgeport, CT 06604


                    MOTION HEARING
        (Motion to Compel Subpoena Compliance
                of Barry Sternlicht)


B E F O R E:
        THE HONORABLE KARI A. DOOLEY, U.S.D.J.














Courtroom Deputy:                 Official Court Reporter:
Kristen Gould, Esq.               Tracy L. Gow, RPR
                    Chambers: 203.579.5522

```
 1 | A P P E A R A N C E S:

 2 | For the Plaintiff:
   |     DAVID SPEARS, ESQ.
 3 |     CHARLITA MAYS, ESQ.
   |     CYNTHIA CHEN, ESQ.
 4 |     Spears & Imes LLP
   |     51 Madison Avenue
 5 |     New York, NY 10010
   |     212-213-6996
 6 |     Email: dspears@spearsimes.com

 7 |     SHAWN STEPHEN SMITH, ESQ.
   |     McCarter & English, LLP
 8 |     CityPlace I
   |     185 Asylum Street
 9 |     Hartford, Ct 06103
   |     860-275-6700
10 |     Email: shsmith@mccarter.com

11 | For Defendants and Witness Sternlicht:
   |     JEFFREY L. WILLIAN, ESQ.
12 |     Kirkland & Ellis LLP
   |     300 North LaSalle Street
13 |     Suite 3800
   |     Chicago, IL 60654
14 |     312-862-2257
   |     Email: jeffrey.willian@kirkland.comDevora Allon
15 |
   |     DEVORA ALLON, ESQ.
16 |     GILAD BENDHEIM, ESQ.
   |     Kirkland & Ellis LLP
17 |     601 Lexington Avenue
   |     New York, NY 10022
18 |     212-446-5967
   |     Email: devora.allon@kirkland.com
19 |             gilad.bendheim@kirkland.com

20 |     MICHAEL MENAPACE, ESQ.
   |     Wiggin & Dana-Htfd
21 |     20 Church Street
   |     Hartford, CT 06103
22 |     860-297-3733
   |     Email: mmenapace@wiggin.com
23 |

24 | Also present:
   |     ALEXIS BEYERLEIN, ESQ. - Law Clerk
25 |
```

1        (Call to Order, 11:05 a.m.)

2        THE CLERK:  Please be seated.

3        THE COURT:  Good morning everybody.

4        ALL:  Good morning, Your Honor.

5        THE COURT:  This is the matter of Compagnie des

6   Grands Hotels d'Afrique v. Starwood Capital -- well, I guess

7   they're not in the case anymore -- Starman.

8        Counsel, please identify yourselves for the record.

9        MR. SMITH:  Good morning, Your Honor.  Shawn Smith

10  of McCarter & English for the Plaintiff, along with my

11  co-counsel, David Spears, Charlita Mays, and Cynthia Chen,

12  all of Spears and Imes.

13       THE COURT:  All right.  Good morning.

14       MR. SPEARS:  Good morning, Your Honor.

15       MR. MENAPACE:  Good morning, Your Honor.  Michael

16  Menapace of Wiggin & Dana for third-party Barry Sternlicht.

17  I'll let my colleagues introduce themselves.

18       MR. WILLIAN:  Good morning, Your Honor.  Jeff

19  Willian with Kirkland & Ellis.

20       MS. ALLON:  Good morning, Your Honor.  Devora Allon,

21  also with Kirkland & Ellis.

22       MR. BENDHEIM:  Good morning, Your Honor.  Gilad

23  Bendheim, also with Kirkland & Ellis.

24       THE COURT:  All right.  We are here because a Rule

25  45 subpoena was served on Mr. Sternlicht -- am I saying that

1  right?

2       MR. WILLIAN:  Yes.

3       THE COURT:  And he did not appear as commanded in

4  that subpoena, so a Motion to Compel his appearance at

5  deposition was filed, to which Mr. -- a motion that Mr.

6  Sternlicht has objected to.

7       I have received the memorandum in support, the

8  opposition, the reply memorandum, and all of its

9  attachments -- and all of their attachments, I should say --

10  excuse me.

11       Is there anything other than those submissions that

12  the parties believe I should have reviewed in advance of this

13  morning's hearing?

14       MR. SPEARS:  No, from plaintiff, Your Honor.

15       MR. WILLIAN:  No, from Mr. Sternlicht, Your Honor.

16       THE COURT:  All right.  I have a number of

17  questions, and I don't think it makes sense for me to sort of

18  pose those questions outside the context of the arguments

19  that you wish to make, but I will be interrupting you as you

20  advance your arguments to the extent your argument implicates

21  some of my concerns.

22       This is the Plaintiff's motion, but these issues

23  would normally be presented by the deponent by way of a

24  Motion to Modify or a Motion to Quash, and, so, I think I'd

25  like to hear from you -- I'm going to ask to hear from Mr.

1    Sternlicht first, and then I'll hear from the Plaintiff.

2            And I'm going to ask you to approach the lectern.

3            MR. WILLIAN:  Good morning, Your Honor.

4            THE COURT:  Good morning.  Let me -- but let me ask

5    a few factual questions up front, just so I understand the

6    parameters under which I'm being asked to rule.

7            As I understand it -- and, Mr. Spears, you can

8    correct me if I'm wrong -- the question that's being

9    litigated in Delaware is whether or not Starman was the alter

10   ego of Woodman, or vice versa, and that the time period at

11   issue is whether that alter ego relationship existed from the

12   time of -- from 2005, the formation of Starman, to 2011.  Is

13   that --

14           MR. WILLIAN:  Yes, that's -- we believe that's a

15   correct statement of the issue, Your Honor.

16           THE COURT:  And, Mr. Spears, do you agree with that?

17           MR. SPEARS:  Almost, Your Honor.

18           It's from the inception of Starman, July 2005,

19   through 2013 when the arbitration was commenced.

20           THE COURT:  Okay.

21           MR. SPEARS:  And thereafter with regard to key

22   events that occurred in the arbitration.

23           THE COURT:  Okay.

24           MR. SPEARS:  It spins into 2014.

25           THE COURT:  Okay.  Okay.  The floor is yours,

1    Counsel.

2              MR. WILLIAN:  May it please the Court, I'm Jeff

3    Willian.  I represent Mr. Sternlicht.

4              Your Honor, we believe that this motion, the Motion

5    to Compel, calls for a classic application of the apex

6    doctrine, which, as the Court knows, has two elements to it:

7              To depose a high-level executive like Mr.

8    Sternlicht, who is a CEO, you need to show his unique

9    knowledge; and that you made an effort to get the information

10   you want from that CEO in some other way, usually deposing

11   lower-level employees.

12             We believe that the Movant has not met either of

13   those elements.

14             First, as to Mr. Sternlicht and nonparty Starwood

15   Capital Group, we've submitted an affidavit to this court --

16   it's a detailed affidavit -- on the duties and the schedule

17   of Mr. Sternlicht.  As you know, he's the CEO of Starwood

18   Capital Group.  It's a very significant company.  They have

19   about sixty billion dollars under assets.  He flies all over

20   the world to deal with and address investors and manage the

21   assets.  He owes, obviously, duties to all these investors

22   with respect to their funds.

23             He's established -- and it's undisputed, but he's

24   established in his affidavit he's, like any CEO of a larger

25   company, he is extremely busy, which of course is the purpose

1    for which the apex doctrine has been put into place.

2            THE COURT:  Let me -- and I'm not going to limit any

3    argument you might want to make.  As I understood the

4    submissions, there are two areas that they wish to depose Mr.

5    Sternlicht on:  One area is his involvement in and knowledge

6    of the Starman, by virtue of his position as one of the -- I

7    think they're called "managers"?

8            MR. WILLIAN:  Managers, yes.

9            THE COURT:  Okay.  All right.  And he was obviously

10   one of many.  And I think I tend to agree with you that there

11   has -- Mr. Spears has some questions to answer as to why that

12   role, that information or his years as a manager create any

13   unique or special knowledge in him, since there were so many

14   other people in the room at the same time, some of whom I

15   think have already been identified in the paperwork and

16   before the Court in Delaware as critical to the Plaintiff's

17   case.

18           MR. SPEARS:  Yeah.

19           THE COURT:  And I think Mr. Drinka is one of them.

20           But the other area that they identify Mr. Sternlicht

21   as being sort of unique to is the period in time leading up

22   to the creation of Starman and what the plan was, in terms of

23   Woodman's position, Starman's role, the relationship between

24   the two.  And it seems to me, and I don't know this but there

25   certainly have been some allegations, that Mr. Sternlicht was

1    central to that pre-formation structuring, financing, and

2    what the end product was going to look like as of July 2005.

3           And the argument about pre-formation, and whether

4    it's in the case or out of the case, whether intent plays a

5    role, these issues have all sort of been discussed in the

6    district court already down in Delaware, but I think that it

7    is that issue that I would ask you to address.

8           MR. WILLIAN:  Okay.

9           So I view them seeking his deposition on two topics:

10   One is formation, which you just mentioned, and two is the

11   factors relating to veil piercing.  So I'll first do

12   formation.

13          THE COURT:  What did -- I'm sorry, I didn't

14   catch the -- the first is formation.  The second is?

15          MR. WILLIAN:  Oh.  The veil piercing claim, where

16   they're looking at various elements, as I identified in the

17   reply brief, that they want to depose him on.

18          THE COURT:  Yes.  And in that -- when they talk

19   about those, they really are talking about his role on that

20   managerial board.

21          MR. WILLIAN:  That's -- we believe that's true; yes,

22   Your Honor.

23          THE COURT:  Well, I think that's what their papers

24   said.

25          MR. WILLIAN:  Yes.

1            THE COURT:  Okay.  So -- in whatever order.

2            MR. WILLIAN:  So, first, as to formation.

3            So obviously the Plaintiff sought extensive

4    discovery regarding formation.  The Court made clear in

5    Delaware that it has limited relevance, in the court's

6    mind -- limited their document discovery as a result.

7            Putting that aside, however, we're talking about the

8    formation of Starman.  It's essentially, you know, a

9    multibillion-dollar acquisition, involving the acquisition of

10   the Le Meridien Hotel in the formation of a joint venture

11   between Starwood Capital Group and Lehman.

12           As the Court can imagine, there are many, many other

13   folks -- business advisors and the like -- who are directly

14   involved in all of that planning.  So, yes, Mr. Sternlicht

15   will have personal knowledge regarding that matter, but he

16   has no unique knowledge.  There's nothing unique about his

17   knowledge that others don't have.

18           THE COURT:  Was he the brains behind the operation?

19   Was this investment opportunity and this transaction, was

20   this his project?  Was this his idea?

21           MR. WILLIAN:  I wouldn't characterize it that way.

22   I mean, he has a management team that obviously has to sign

23   off on all of this.  He has Management Committees.  Sure,

24   he's involved and he obviously has input and he obviously has

25   to approve and be on board.  But to say that this is his

1   brainchild or unique to his decision-making I don't think is

2   fair.  I mean, with a company of this nature, there better be

3   lots of people on board, signing off and involved in these

4   decisions -- and there were, of course.

5           THE COURT:  And what were the documents that were

6   produced?  I saw that there was a document that was submitted

7   to the EU, and there were some other pre-formation Governance

8   documents.  What was the scope of the document production

9   that pre-dated July of 2005?

10          MR. WILLIAN:  So the scope of the document

11  production pertains to essentially formation, formation

12  issues.  And so it's not extremely broad, the Court has

13  limited that discovery.

14          So, as to formation, Mr. Sternlicht has no unique

15  knowledge.  If you read Plaintiff's reply brief, they spend a

16  lot of time, then, talking about his relevant knowledge or

17  personal knowledge -- not unique knowledge -- regarding the

18  veil piercing factors.  And they specifically cull out three:

19  Capitalization, corporate formalities, and insolvency.  Those

20  are the three they focus on on page 4 and 5 of their reply

21  brief.

22          But, Your Honor, when you think about those factors,

23  those factors all involve objective facts.  They all involve

24  document heavy-type issues.  So, for example, corporate

25  formalities.  Mr. Sternlicht is not going to have any unique

1  knowledge regarding corporate formalities.  That's an issues

2  of, Did they following formalities, Are there minutes, Did

3  the directors vote, and the like.  No unique knowledge there.

4  Capitalization, same issue:  Well, what's the

5  capital?  What are the numbers?

6  Those are all objective facts established by

7  documents.

8  Insolvency.  I'm sure you've dealt with insolvency a

9  lot.  That's, again, you know, often expert-intensive,

10  objective, document driven-type issue.  And it should be

11  clear, hopefully, to the Court, that a CEO is not going to

12  have unique knowledge in those areas; particularly, where

13  here he is one of many managers -- 18 in total -- who govern

14  the Starman entity and where decisions were made essentially

15  by consensus.

16  So we would submit to the Court that there has been

17  no showing, whatsoever, of unique knowledge on behalf of Mr.

18  Sternlicht by the Plaintiff.  He's denied it in his

19  affidavit.  The facts support that, because he was not a lone

20  manager for Starman.  He was one of many.

21  And in addition to the lack of unique knowledge, the

22  Court, of course, should look to any efforts made by the

23  Plaintiff to gather the information they seek from -- in this

24  case, the CEO -- and have there been any such other efforts?

25  And as we stand here, Your Honor, there's been zero

1  efforts to get any of this information regarding formation,

2  the veil piercing element, from anybody else.  They have not

3  noticed a single deposition, let alone take one.  They

4  haven't even noticed a single deposition of all of these

5  other witnesses who would have knowledge regarding these

6  facts.

7          Not only that, document production has not even be

8  complete.  So they're still producing documents, we're still

9  producing documents, yet they've rushed to depose Mr.

10 Sternlicht, who has no unique knowledge.  We would suggest to

11 the Court that that is -- calls for a classic application of

12 the apex doctrine.

13         If this Court, as we would hope it would do, denies

14 this motion, without prejudice --

15         THE COURT:  I think it would have to be without

16 prejudice.  It's going to be decided on whether or not the

17 record at this juncture suggests that this deposition should

18 go forward in this litigation.

19         MR. WILLIAN:  Yes.  And if the Court would deny the

20 motion without prejudice -- we agree with that -- there's no

21 prejudice to the other side.  They'll have a chance to

22 eventually get our documents, we can look at their documents,

23 they can depose who they want.  And then they have until the

24 end of May, as the schedule currently stands, to engage in

25 discovery.  If at some point they can show that Mr.

1   Sternlicht has knowledge that they need, and they
2   meet-and-confer with us and they establish it, after having
3   gone through the steps of trying to depose other people, I'm
4   sure we can reach a resolution on his deposition in good
5   faith.

6        But there would be zero prejudice to them if you
7   deny their motion; however, of course, there would be
8   prejudice to Mr. Sternlicht if he's forced to give a
9   deposition under these circumstances, where I think the Court
10  can reasonably conclude it is designed for leverage, if not
11  harassment purposes, because there is no real need to depose
12  Mr. Sternlicht now.

13       Importantly, he's the CEO of Starwood Capital Group.
14  They are not a party to that case. They are not a party.
15  They were sued by Plaintiff. They were dismissed. The
16  Plaintiffs aren't happy about it. So what have they turned
17  around to do? They're trying to depose the CEO before they
18  depose anyone else of the dismissed party. Again, we would
19  suggest to the Court that that is why we have the apex
20  doctrine, and we'd ask the Court to apply it.

21       THE COURT: If I read your papers correctly, it
22  was -- you have also posited a litigation strategy in
23  connection with this deposition having to do with deadlines
24  on their ability to amend the complaint.

25       Let me ask you to -- if you still assert that issue,

1    let me ask you to expand on that a little bit.

2            MR. WILLIAN:  Sure.  So Starwood Capital Group was

3    dismissed from the complaint.  There was a deadline in which

4    to add additional parties.  Plaintiff -- I believe there's a

5    statement in the Delaware court, where they're seeking to

6    depose Mr. Sternlicht before that deadline, presumably

7    because they were going to try to bring Starwood Capital back

8    into the case.  That deadline has come and gone, and they

9    have not made any type of motion in the court to extend it

10   for any reason.

11           So I think there's, arguably, an inference that the

12   purpose of deposing Mr. Sternlicht was trying to overcome, if

13   not second-guess, the ruling of the district court that

14   Starwood Capital should not be a party to that Delaware

15   action.

16           THE COURT:  Was the -- the Court did not -- and

17   correct me if I'm wrong, but the dismissal wasn't without

18   prejudice to trying to re-plead and satisfy an agency claim;

19   was it?

20           MR. WILLIAN:  I don't believe the Court said it is

21   with prejudice so that they could never try to add them ever

22   again, that's correct.

23           THE COURT:  Okay.  I have no current questions.  I

24   didn't want to interrupt you or cut you off.

25           MR. WILLIAN:  Thank you, Your Honor.  Appreciate

1   it.

2           THE COURT:  Okay.  Mr. Spears.

3           MR. SPEARS:  Yes, Your Honor.  Thank you.

4           Let me get organized here, if I may, Your Honor.

5           May I proceed, Your Honor?

6           THE COURT:  Yes, please.

7           MR. SPEARS:  Mr. Sternlicht is a core witness with

8   the personal involvement in the events of this case that

9   relate to the alter ego scheme.  It is fair to split it into

10  two buckets, as Your Honor did it.  He was -- he was the

11  brains of the deal.  He issued a press release in 2005 at the

12  time of the deal, identifying himself --

13          THE COURT:  You're starting with the formation

14  testimony?

15          MR. SPEARS:  You want me to start the other way?

16          THE COURT:  That's fine.  I just want to make sure I

17  know where we're going.

18          MR. SPEARS:  And I respectfully point the Court to

19  page 6 of our opening brief, the press release where Mr.

20  Sternlicht personally was quoted about two years engineering

21  this deal, how important it was to put Starwood Hotels and

22  Resorts into it.  Of course, he controlled Starwood Hotels

23  and Resorts at that time.  Major ownership position.  He had

24  been CEO and chairman of the board for years.

25          Putting Starwood Hotels and Resorts into the deal,

1   they made Woodman, as a first act, sign an agreement with

2   Starwood Hotels and Resorts, where Woodman delegated all of

3   its responsibilities to Starwood Hotels and Resorts.

4           THE COURT:  Okay.  I'm going to stop you there for

5   just a moment.  I mean, this is an enormous transaction, and

6   it makes perfect sense to me that they're going to put the

7   CEO on the face of whatever publicity attaches to this

8   transaction.  But it would be naive, I think, to believe that

9   he is -- was operating, either as a singular individual -- I

10  mean, there's got to be scores of people who put this deal

11  together.

12          And so, my question for you is:  Why him and why

13  now, since we haven't heard from -- you haven't heard from

14  any of those people yet?

15          MR. SPEARS:  Yes.

16          THE COURT:  And if you were to, for example, depose

17  somebody, and they said, Well, all I can tell you is what Mr.

18  Sternlicht told me to do; All I can tell you is that Mr.

19  Sternlicht was calling the shots, issuing the memos; He

20  wanted it structured this -- I mean, until we have some

21  indication that, in fact, he wasn't just the public face of

22  this enormous transaction but a critical component or person

23  involved in the structuring, and whatnot, why now?

24          MR. SPEARS:  Now, Your Honor -- may I also, after I

25  talk about why now, may I also address your comments about

1   scores of people?

2           THE COURT:  Yes.

3           MR. SPEARS:  Okay.  Sure.

4           It makes sense to do him as the first witness

5   because he is -- his structuring of the transaction is the

6   starting point of our proof in this case.  The insertion of

7   the company that he controlled, Starwood Hotels and Resorts,

8   into this transaction made Woodman Starman's alter ego.

9   There were only --

10          THE COURT:  I guess that's my question.  I'm not

11  going to interrupt you again.  You said "his structuring" of

12  this transaction.  How do we know that on a personal level he

13  structured this transaction?  How do we know it wasn't his

14  team of lawyers or a conglomerate of businesspeople combined

15  with finance people, combined with legal people?

16          MR. SPEARS:  His -- it's a fair inference from the

17  fact that in the press release he took credit for it, and

18  from the fact that he -- not anyone else -- was a major owner

19  of Starwood Hotels and Resorts and controlled Starwood Hotels

20  and Resorts.  No one else had an incentive to put Starwood

21  Hotels and Resorts into the case.  Mr. Sternlicht had an

22  interest --

23          THE COURT:  You mean in the transaction?

24          MR. SPEARS:  I beg your pardon?

25          THE COURT:  You said "into the case."

1          MR. SPEARS:  In this transaction.

2          THE COURT:  Okay.  In the transaction.

3          MR. SPEARS:  No one else had his interest in

4    Starwood Hotels and Resorts.  He took credit for it.  He had

5    a special motive and interest and --

6          THE COURT:  That's what CEOs do.

7          MR. SPEARS:  I beg your pardon?

8          THE COURT:  That's what CEOs do.

9          MR. SPEARS:  Well, sometimes it's because they

10   deserve it, you know.

11         THE COURT:  Okay.  Fair enough.

12         MR. SPEARS:  And, so, he took it here.  And I don't

13   think it's a fair inference to say, Well, he couldn't have

14   done it himself, he's taking credit for it insincerely, other

15   people did it and he's taking credit for their work.

16         He came forward and took credit for it.  He put his

17   face forward as the face of this transaction.  Yes, there's a

18   lot of money involved, but there are a limited number of

19   hotel properties.  There were only a couple of dozen, I

20   believe, hotel properties at issue, so they all were worthy

21   of consideration.  And it's not like there were thousands of

22   hotels around the world.  There were very few, actually.

23         And, so, Woodman is a place of particular interest,

24   and it has a classification in documents that we have

25   received so far.  It makes sense to do him first because he

1 knows more about it than anyone else. We don't even know who

2 the other people would be who helped him structure it. We'd

3 have to go ask multiple other people, Who structured it, Did

4 Mr. Sternlicht -- I mean, he can tell us that right off the

5 bat.

6         He is the most efficient way to get this

7 information. We said so in the complaint. We included his

8 name in our Rule 26 witness disclosures after SCG had been

9 dismissed. He is the starting point. He's the cornerstone

10 of our allegations in the complaint and of the case we want

11 to present at trial.

12         It makes sense to do him now because he's not going

13 to be -- he is not a witness cust -- a document custodian.

14 We're not getting his e-mails. We're getting e-mails of lot

15 of other people, but not his, so it's not like we should wait

16 until we see his e-mails. That's a very important point.

17         What we have now is his press releases, where he

18 takes credit for it. We have the contract by which Starwood

19 Hotels -- or Woodman is required to delegate all its

20 operating authority to Starwood Hotels and Resorts, which

21 left Woodman a shell and an alter ego to accrue liability.

22         We have the interrogatory response, where Starman

23 has told us that he was one of the six original -- one of the

24 six original members of the Management Committee, one of

25 three from Starwood Capital Group, and he continued in that

1  role for six years.  Others came and went.  The Lehman

2  Brothers' representatives went off when Lehman Brothers went

3  into bankruptcy in 2007 and 2008, and caretakers were

4  appointed to that job.

5       So he's there for six years.  No one else is there

6  that long.  There's another individual --

7       THE COURT:  I'm going to -- you've morphed from

8  formation to management, so --

9       MR. SPEARS:  Okay.  Fine.  So let me go back to the

10  point you asked.  Thank you.

11       We have the management agreement, which sets out his

12  responsibilities and powers.  And we have the -- some of the

13  important organic documents, organic planning documents.

14  We've gotten them from third parties.  We've gotten documents

15  from Starwood Hotels and Resorts, and we have the documents

16  that we want and need to examine Mr. Sternlicht about the

17  formation, the corporate planning, and we don't anticipate

18  getting e-mails about that.

19       We're ready to go now.  This is the beginning of the

20  foundation of our case.  We said so in the complaint.  We say

21  so now.  He's an essential witness.

22       And, Your Honor, with regard to this point, and

23  other point which I will get to when you like, I'd like to

24  talk about what an apex witness is, because he is not an apex

25  witness.  An apex witness is someone who is far removed from

1    the relevant events and not personally involved.

2            He argues that he's the head of a large

3    organization -- he is -- and that he's busy.  But the fact --

4    the courts have said, the fact that you're busy, you're a

5    corporate executive and you're busy, means nothing in terms

6    of whether you can be deposed.

7            He says he's not a party.  No witness is a party.

8    We have an LLC entity that's the party.  No witness is a

9    party.  But he's identified in the complaint as a non -- as a

10   relevant nonparty, and he was interested and is interested in

11   this transaction like no other person.

12           Starwood Capital Group owns 50 percent of Starman

13   today.  They did from the beginning.  He owned Starwood

14   Capital Group.  He was deeply involved in the events.  He

15   took credit for structuring the transaction, and he was the

16   first and longest serving member of the Management Committee.

17           For the sake of argument only, I ask Your Honor to

18   consider what the cases say about an apex witness.  In the

19   first place, they say it's extremely rare for someone to have

20   that designation, and they also say that claiming to be an

21   apex witness does not exempt you from discovery.

22           He submitted an affidavit saying he doesn't have any

23   unique knowledge, but he misconstrues what that term means,

24   because he construes it to mean, I don't have unique

25   knowledge, I don't have anything that other people might not

1    have, as well.

2         But he cannot dispute that he was deeply involved in

3    the events at issue here.  That makes him not an apex

4    witness.  An apex witness is someone who is far away from it,

5    and they're pursued as a means of putting leverage on the

6    company.  He's our core witness.  That's not what's happening

7    here.

8         In the *Weber* case --

9         THE COURT:  What is -- and sort of morphing a little

10   bit here, but what does he bring to the table that all of the

11   other people on this management team don't?  I mean, whatever

12   they did is documented, whoever was there is documented, the

13   decisions they made.  You've got six people sitting around a

14   table making decisions for an entity.  What makes him,

15   setting aside the question of whether he can be identified as

16   apex in the first place, but --

17        MR. SPEARS:  I'd like to come back to that,

18   respectfully.

19        THE COURT:  Because I know we need to be talking

20   about "unique" once that threshold is established.

21        MR. SPEARS:  Yeah.

22        THE COURT:  But setting aside that issue for a

23   moment, what makes his unique?  I think, Mr. Spears, when you

24   were in Delaware, or maybe there was a telephone call, you

25   identified Mr. Drinka as key to the case.

1        MR. SPEARS:  As key to certain aspects.

2        THE COURT:  And when he was brought in and what he

3    did and what he knew, et cetera.

4        MR. SPEARS:  He came in 2010, five years after Mr.

5    Sternlicht had been on the Management Committee.

6        THE COURT:  So my question is -- well, doesn't it

7    make sense to -- or why haven't you deposed this key witness,

8    who could be the doorway to deposing Mr. Sternlicht?

9        If I'm not convinced at this juncture that that

10   deposition should go forward -- and I haven't decided it one

11   way or the other, I want to be clear.

12       MR. SPEARS:  Yeah.

13       THE COURT:  But I'm reading through and I'm

14   thinking, Why haven't we talked to this person who's

15   considered a key witness and who you allege that everything

16   he did was at Mr. Sternlicht's behest?  And Mr. Drinka,

17   presumably at Mr. Sternlicht's direction, promptly assumed

18   primary responsibility for dealing -- I mean, these are some

19   pretty powerful allegations, and if proven, presumably will

20   help your case considerably.

21       If you want to depose Mr. Sternlicht, doesn't it

22   make sense to ask Mr. Drinka first:  Did you do all of this

23   at his direction?

24       MR. SPEARS:  Respectfully, no, Your Honor.

25       THE COURT:  Okay.

1    MR. SPEARS:  Because Mr. Drinka makes his first

2   appearance in 2010, after Mr. Sternlicht has been on the

3   Management Committee for six years.  No one else lasted that

4   long.  Mr. Sternlicht was the glue on the Management

5   Committee.  Six years.  Other people came and went.  He

6   stayed.

7        It's important -- what's unique about him is that,

8   first, he claimed to be the mastermind or the brains of the

9   deal.  Then when you look at the Starman, LLC, agreement,

10  which we have received in discovery, it gives the members of

11  the Management Committee extraordinary powers, including

12  hiring the officers of Starman, which Mr. Sternlicht,

13  presumably, played a major role in.  He's there for six

14  years.  It gives him the authority to actually -- the

15  Management Committee the authority to actually run the

16  subsidiaries, such as Woodman.

17       So, that's in the language of the LLC agreement.  So

18  it starts out, in July 2005 he claims "I'm the brains of the

19  deal," then he immediately goes on the Management Committee

20  of -- the small Management Committee of Starman as one of

21  six.  Stays on it for six years.  Other people come and go.

22       It's a very fair inference, Your Honor, that this

23  man knows a lot, knows more than other people.  Just because

24  he claims to be busy is not a reason, when he's deeply

25  involved.

1          THE COURT:  Couldn't agree with you more, busy

2     doesn't get you over the hurdle.

3          MR. SPEARS:  Yeah.

4          He's deeply involved in the formation, in the

5     structuring of the deal which created alter ego status, and

6     in the initiation of the relationship between Starman and

7     Woodman, and here's how.  We say that Woodman was initially

8     undercapitalized.  Mr. Sternlicht is on the Management

9     Committee of Starman when it first comes into being.  One of

10    the first things you have to do is make a decision about

11    capitalizing your subsidiaries.  Woodman was underwater deep,

12    from the beginning.  That never got fixed.

13         Mr. Sternlicht, as a member of the Management

14    Committee for six years, surely participated in decisions

15    about capitalization and undercapitalization, which

16    are -- and that is an element of our case.

17         THE COURT:  Were the -- I mean, I have to contend

18    with his affidavit that says, I don't have any present

19    recollection of what was involved in those management

20    meetings.

21         And I understand that you might have the right to

22    test that, but are the -- and this is partly because the case

23    isn't pending before me.  Do you have -- were there minutes

24    of those management meetings?  Do you have the record of the

25    decisions that were made, for example, about capitalization,

1   hiring, things of that nature?  Or are you sort of working in

2   a, you know, black box, in terms of what happened at those

3   meetings?

4        MR. SPEARS:  No, we don't have those materials, Your

5   Honor.  But the LLC agreement expressly gives the members of

6   the Management Committee that authority.  And I don't think

7   we need a lot of paper from Starman to be entitled to a

8   reasonable inference that the members of the Management

9   Committee talked about capitalization of the subsidiaries

10  from the get-go.  For instance, Your Honor, in the use of

11  those entities as a corporate facade for Starman, which is

12  what they did, the --

13       THE COURT:  That's sort of the core allegation;

14  isn't it?

15       MR. SPEARS:  I beg your pardon?

16       THE COURT:  That is the core allegation.

17       MR. SPEARS:  Yes.

18       So what happened was, the LLC agreement gives them

19  the authority to appoint direct officers to manage the

20  company.  So key question for Mr. Sternlicht:  When you were

21  structuring the officer management of the subsidiaries, was

22  it Starman's plan to staff those subsidiaries with their own

23  personnel and make them autonomous functioning individuals

24  subject to corporate parent oversight, or did you hire people

25  for Starman with the intention that they would manage those

1  subsidiaries and corporate formalities would not be observed

2  because, in fact, Starman would act for Woodman?

3  That's what we say happened, in the complaint, Your

4  Honor.  And he was one of the people at the beginning who was

5  supposed to hire the officers and give them their remit about

6  what their job was.

7  No dividends.  That is an element that we prove for

8  alter ego.  He's there for six years.  There were no

9  dividends from Woodman.  We're entitled to ask him about that

10 and establish the fact for use at trial.

11 He -- the corporate facade.  Members of the

12 Management Committee at Woodman have to know that Woodman is

13 being used as a facade.

14 THE COURT:  I'm sorry.  Members of the Management

15 Committee at Woodman?

16 MR. SPEARS:  Starman -- forgive me -- have to know

17 that it's being used as a facade, because they didn't -- they

18 hired their own people to speak on behalf of Woodman.  So

19 that's all, you know, unique information that he has.

20 And, Your Honor, I would just like to tell you what

21 the courts of this district and other districts have said

22 about what "unique knowledge" means.  May I do that?

23 THE COURT:  Of course.

24 MR. SPEARS:  Okay.  So in the *Weber* case, District

25 of Connecticut, 2011, Judge Arterton.  It was the CEO of a

1　worldwide conglomerate, Fujifilm, Judge Arterton required the

2　CEO to testify.  And she said:  The question is whether he

3　has unique knowledge about the nature and extent of his own

4　involvement or the leadership of the Defendant as a whole.

5　　　　Here, Mr. Sternlicht certainly has knowledge about

6　his own involvement and about the leadership of Starman,

7　because he was there for six years participating in that

8　leadership.  He's not high up, barely ever hearing about this

9　stuff.  He's a key player.

10　　　　The *Mendillo* case, District of Connecticut, 2013.

11　It says at page 2:  Depositions of senior executives are

12　permissible when they have had direct involvement in the

13　underlying claims.

14　　　　The *Miller* case, District of Connecticut, 2008,

15　Judge Dorsey.  Page 2, he said:  Top corporate executives are

16　not immune from discovery.  The fact that an executive has a

17　busy schedule cannot shield him.  A claimed lack of personal

18　knowledge is not sufficient.  The examining party is entitled

19　to test that claim by deposing the witness.

20　　　　Your Honor, if a witness could say, "Here's my

21　affidavit, I don't remember anything," and be excused from

22　participating in discovery, no one would ever participate in

23　discovery.

24　　　　THE COURT:  Would you be -- we've talked about the

25　two sort of buckets, in terms of a line of inquiry.  A

1  concern has been raised that this is an effort to go back

2  after SCG, to either bring them back into the case or to

3  otherwise -- well, to bring them back into the case.

4       If I were to permit the deposition to go forward,

5  but limited it to really the two things we're talking

6  about -- the transaction, the initial transaction and how it

7  was structured, and what role he played and whatnot, and then

8  the post-formation interactions between Starman and Woodman

9  and his role in the Management Committee -- leaving off sort

10  of the going upstream, as it were, you know, focusing on a

11  downstream line of inquiry, would you have any concerns about

12  a limitation of that nature?

13       MR. SPEARS:  I think that would be a very reasonable

14  limitation, Your Honor.  That is our plan.  We're not

15  planning to try to go upstream.  We want to talk about the

16  two buckets, just as I have detailed for the Court.  We want

17  to talk about his personal involvement in the creation of

18  Starman, the structuring of the transaction, and his actions

19  on the Management Committee of Starman.  That's what we want

20  here.  That's key to our alter ego case.

21       And, Your Honor, may I -- in that connection, I just

22  want to tell you about two more cases.  The *Roberts* case, out

23  of the Western District of New York in 2014, is cited.  It

24  says that:  A so-called apex witness may be subject to

25  deposition because he has personal knowledge and a unique

1 perspective that is unavailable from others.

2 We believe that describes Mr. Sternlicht in both
3 buckets here.

4 And, finally, Your Honor, I would just like to read
5 to you briefly from the *Louis Vuitton* case, 2006.  It's cited
6 by Mr. Sternlicht's counsel.  At page *13, the Court said,
7 quote:

8 "From the declarations proffered by Mr. Carselle" --
9 the CEO of one of the largest conglomerates in the world --
10 "it appears that a deposition may produce little in the way
11 of useful information.  Nonetheless, that is not a proper
12 basis for refusing to allow a party to question a witness who
13 has participated in events directly pertinent to at least one
14 of the claims in the case.  There is simply no basis for
15 compelling Defendant to take at face value an assertion of
16 lack of memory made in an affidavit by a witness.  This
17 scenario is simply not equivalent to those encountered in
18 cases in which a senior executive has not participated in any
19 activity relevant to the issues in the case."

20 Mr. Sternlicht was all over the activities that are
21 relevant in this case.  No one is more central than Mr.
22 Sternlicht.  Mr. Drinka comes in later.  He's got important
23 stuff to tell us about insolvency, and also about injustice
24 or unfairness that the use of Starman as an alter ego
25 operated as an injustice or unfairness to Plaintiff, which

1    we're required to prove.  We think Mr. Drinka is the face of

2    the injustice or unfairness that happened, but as far as --

3              THE COURT:  I'm sorry.  Can I assume that you will

4    be asking Mr. Drinka whether he was acting at the direction

5    of Mr. Sternlicht?

6              MR. SPEARS:  He hasn't been deposed.  We haven't --

7    he is a document custodian.  We're waiting for documents from

8    him.  We expect e-mails.  We have no reason -- as I said, Mr.

9    Sternlicht is not a document custodian, and we see no need to

10   wait for e-mails.  We see no need to wait at all.  We talked

11   about the fact that --

12             THE COURT:  That wasn't my question, Mr. Spears.  Do

13   you intend to ask Mr. Drinka whether or not his action --

14             MR. SPEARS:  Yes.

15             THE COURT:  Thank you.

16             MR. SPEARS:  Yes.  I'm sorry.

17             THE COURT:  Thank you.

18             MR. SPEARS:  I wasn't trying to be evasive, Your

19   Honor.

20             But it's a different part of the case.  I mean,

21   insolvency, there's some overlap.  But the members of the

22   Management Committee for six years got -- you know, as part

23   of the exercise of their responsibilities, must have gotten

24   financial statements for Starman.  It would have consolidated

25   financials.  Woodman is in there.  It operated on a

1  going-concern basis.  It didn't have enough assets to cover

2  its liabilities, which is key proof for us.

3            THE COURT:  Woodman or Starman?

4            MR. SPEARS:  Woodman -- forgive me.

5            Woodman operated on a going-concern basis.  It could

6  only continue to operate, even though it was insolvent, based

7  on Starman's commitment to prop it up financially.

8            We want to ask Mr. Sternlicht about it.  It's

9  unthinkable that he was on the Management Committee and

10 didn't look at the financial statements.  There's just --

11 there's no one like him, Your Honor.  We considered the fact,

12 without getting -- waiving work product.  We'd considered the

13 fact that if we take him now we won't be able to take him

14 later.  We want to take him now -- not to add SCG back -- as

15 the core witness in our alter ego case against Starman.

16           We have the documents we need, and we're ready to

17 commit.  And if we get something later that we wish we had

18 had, that's our problem.  Frankly, we think we've got what we

19 need.  We've got plenty to ask him, very important questions

20 to ask that are critical to our case.

21           He's not an apex witness because he was more deeply

22 involved than anyone in both buckets.  He put himself forward

23 as the face of the first bucket, and in the second bucket he

24 put himself forward to be the longest-serving member of

25 Starman's Management Committee, including up through the time

1    when Starman sold Woodman to a mysterious third party, who

2    promptly put it into bankruptcy a year after the arbitration

3    had been ongoing.

4          One more thing, Your Honor, if I may.  If you want

5    to ask a question, I'll wait.

6          THE COURT:  I haven't formulated it yet.  Go

7    ahead.

8          MR. SPEARS:  Okay.  So the rules on discovery say

9    that the parties have to stipulate if it's not an authorized

10   period for a deposition.  We've been past Rule 26 disclosures

11   for a long time.  This is the time to take depositions.

12         Judge Andrews, in Delaware, gave us 70 hours for

13   depositions and 10 witnesses.  He said you can come back if

14   you need more.  We expect to take a lot of depositions.  It's

15   supposed to be over a few months after we get the documents.

16   We're going to get squeezed on depositions.

17         In a case like this, we're going to get

18   double-tracked.  Mr. Sternlicht is -- you've seen his

19   affidavit.  He's too busy for school.  And we need to get

20   this out of the way now.  We're ready.  We take

21   responsibility for it.  We accept the limitation that Your

22   Honor proposed, and we feel we should be entitled to do it,

23   particularly for someone who is at the core in terms of his

24   involvement.

25         THE COURT:  Do you anticipate using seven of your 70

1    hours on Mr. Sternlicht?

2          MR. SPEARS:  We very well might.  Hope not.

3          THE COURT:  All right.  Give me one second.

4          (Pause.)

5          THE COURT:  Okay.  Thank you.

6          MR. SPEARS:  Thank you, Your Honor.

7          THE COURT:  Do you wish to respond?

8          MR. WILLIAN:  Yes, Your Honor, briefly.

9          THE COURT:  I think I may have mispronounced your

10   name.  Is it Willian?

11         MR. WILLIAN:  Yes, it's Willian.

12         THE COURT:  I apologize.

13         MR. WILLIAN:  No.  No problem.  I answer to both.

14         Counsel's words really confirms that you should deny

15   their Motion to Compel.  We heard words like he's -- Mr.

16   Sternlicht -- is a starting point.  It should be a fair

17   inference that he knows a lot.

18         Those are quotes.

19         He put his face forward.  He was one of the people.

20         These are all quotes.

21         They hired their own people.  There were other

22   managing directors.

23         All of that confirms that Mr. Sternlicht should not

24   be deposed now.

25         There's two elements to an apex -- to taking an Apex

1　Deposition.  Not only do they have to show unique knowledge,

2　but they have to show that they made an effort to depose

3　other people.  They did not do that.

4　　　　　THE COURT:  Talk to me for a moment -- I'm sorry.

5　　　　　Talk to me for a moment about his sort of threshold

6　question of whether an apex witness, sort of by definition,

7　was not involved in the events in question.  Because if

8　he -- even though he is clearly at the top of the corporate

9　chain here -- I guess I'll pose it as a hypothetical.

10　　　　　Say there is a shareholder derivative action brought

11　against a corporation such as SCG, and the allegation is that

12　the CEO strong-armed the board to do something that was not

13　in the best interest of the shareholders but may have been in

14　the best interest of the CEO for other reasons.

15　　　　　That is not a situation, you would agree, where the

16　CEO becomes an apex witness that can't be deposed absent

17　these other requirements being met?  He's clearly at the

18　center of the events which form the basis of the claim.  Do

19　you agree with that?

20　　　　　MR. WILLIAN:  Particularly if he's been sued

21　personally, yes, I do.  And that's also a party.

22　　　　　So here we have a situation --

23　　　　　THE COURT:  Okay.  He's not sued.  It's a

24　shareholder derivative suit.  He's not a party, he's a

25　witness.

1       MR. WILLIAN:  Yes.

2       THE COURT:  Same answer?

3       MR. WILLIAN:  Do I believe that he's not an apex

4  deponent in that case?  I could see the argument that he's

5  not, because he actually is, in that case, the central

6  figure, under your hypo, for strong-arming the board.

7       But that's not the case here.  As you pointed out,

8  when it comes to structuring, there's going to be all kinds

9  of other witnesses and advisors who have the same knowledge

10  that he has.  There's nothing that he did that was unique.

11       And I did want to correct the claim that's been put

12  forward that he was -- he put forward the fact that he was

13  the mastermind of this structuring, that he was the brains

14  behind the operation.  There's nothing like that out there.

15       So that's -- again, that just demonstrates that the

16  facts, in a sense, are being made up to try to create this

17  unique knowledge.  And that's exactly why apex requires you

18  to take depositions, create a record in order to establish

19  his unique knowledge.

20       Yes, he has personal knowledge.  We get that.  But

21  that does not in any way suggest he's not an apex witness.

22  The apex doctrine does not say that the CEO -- in this

23  case -- must have no knowledge.  Obviously you'd have to have

24  some showing of personal knowledge to get deposed even under

25  apex.  That's not the issue.  Apex is made -- essentially a

1    policy decision, that in the case of high-level executives

2    and a CEO, you must depose others first to create

3    efficiencies for that CEO; otherwise, there's a potential for

4    abuse and harassment.

5         And that, we would argue, is essentially what's

6    going on here, because there's no logical reason to start

7    with Mr. Sternlicht before all the documents that have been

8    produced, before -- and there's a complaint that they don't

9    know who the other advisors are who structured the

10   transaction.  Send out interrogatories.  Send out a 30(b)(6).

11   None of that's been done.  Because they're not really after

12   information for discovery for purposes of their case.  They

13   just want to harass Mr. Sternlicht.

14        We would ask the Court --

15        THE COURT:  To what end?  I mean, to what end?

16        MR. WILLIAN:  To what end?  Because they know

17   that --

18        THE COURT:  We're talking about very accomplished,

19   respected, capable counsel.  They have a lot to do.  And I

20   can't imagine, frankly, that harassing an adversary or a

21   former adversary's CEO makes it to the top of the to-do

22   list.

23        MR. WILLIAN:  Well, you could be right, Your Honor.

24   Maybe it's not harassment.  The good news is, the apex

25   doctrine doesn't look into motive.  And we're not suggesting

1  that motive should carry the day either way, nor did I, in my

2  main argument, suggest that's the reason why you should deny

3  the motion.  It's because they have not satisfied the

4  elements of the apex doctrine.

5          THE COURT:  All right.  Thank you.

6          MR. WILLIAN:  Thank you.

7          THE COURT:  Mr. Spears, anything further?

8          MR. SPEARS:  May I be very brief, Your Honor?

9          THE COURT:  Yes.

10         MR. SPEARS:  There is a record, Your Honor.  We did

11 send out an interrogatory.  We sent out an interrogatory that

12 said, Who were the governing corporate individuals for

13 Starman during the period of the lawsuit?

14         We get back their answer, we open it up:  Mr.

15 Sternlicht, for six years.

16         We didn't know this.  This came as a surprise to us.

17 And that was a critical piece of information that figured

18 into our thinking, in terms of our strategy and what we're

19 doing now.  And it puts him in a completely new perspective,

20 and it removes him from the category of apex witness.

21         THE COURT:  Just so I'm clear.  It's my

22 understanding that when you served the subpoena, it was more

23 focused or directed to the first bucket we talked about, the

24 formation, and that the information appeared in the

25 interrogatory after the subpoena was served.

1          MR. SPEARS:  That may be, Your Honor.  I don't

2    remember the sequence, in terms of the subpoena versus when

3    we got the interrogatory responses, but we -- it was always

4    our intention to take him with regard to the first bucket,

5    and then we get the interrogatory responses and the Starman

6    LLC agreement, and have a very firmly developed record about

7    his deep involvement in the management and governance of

8    Starman.  We do have a record.  We have the agreements we

9    want to ask him about.

10          And as to the first bucket, we have a very clear

11    record of Mr. Sternlicht speaking in the press releases.  His

12    company issued these press releases.  He put himself forward.

13    That's a record.

14          THE COURT:  Okay.  Thank you.

15          MR. SPEARS:  Thank you.

16          THE COURT:  Mr. Willian, anything else?

17          MR. WILLIAN:  To your first question, Your Honor,

18    the subpoena on Mr. Sternlicht for his deposition was served

19    before they learned that he was on -- a manager for Starman.

20          THE COURT:  I thought I saw that in your papers.

21          MR. WILLIAN:  You are right.  Thank you.

22          THE COURT:  Thank you.

23          All right.  Okay.  You've both given me some things

24    to think about, and I do want to go back and re-read a couple

25    of -- more than a couple -- of the cases on which you each

1  rely.  But I will get something out quickly, in terms of a

2  decision.

3          Anything else we can do here today?

4          MR. WILLIAN:  No, Your Honor.  Thank you.

5          MR. SPEARS:  No, Your Honor.  Thank you for hearing

6  us.

7          THE COURT:  Okay.  We're in recess.

8          (Proceedings adjourned, 12:05 p.m.)

9

10          COURT REPORTER'S TRANSCRIPT CERTIFICATE

11  I hereby certify that the within and foregoing is a true and

12  correct transcript taken of the proceedings in the

13  above-entitled matter.

14

15                          /s/  Tracy L. Gow
                            Tracy L. Gow, RPR
16                          Official Court Reporter

17

18

19

20

21

22

23

24

25